UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

EDWARD WILLIAMS and SHANAISIA LAWSON,

        Plaintiffs,

v.

THE CITY OF NEW YORK, DETECTIVE DANIEL AYBAR, DETECTIVE EUGENE JONNY, DETECTIVE JOHN SIOKAS, POLICE OFFICER YURIY MANZUROV, SERGEANT LUKE DENESOPOLIS, UNDERCOVER POLICE OFFICER "C0033", UNDERCOVER POLICE OFFICER "C0278", JOHN DOE #1-2,

        Defendants.

**MEMORANDUM AND ORDER**
16-CV-01904 (LDH) (RER)

---

LaSHANN DeARCY HALL, United States District Judge:

  Plaintiffs Edward Williams and Shanaisia Lawson assert claims pursuant to 42 U.S.C. § 1983 against Defendants Detective Daniel Aybar, Detective Eugene Jonny, Sergeant Luke Denesopolis, and Undercover Officer 33 ("UC33") for false arrest and failure to intervene. Williams asserts additional § 1983 claims against all Defendants for malicious prosecution and against Defendant Aybar for denial of his right to a fair trial.[1] Defendants move pursuant to Rule 56 of the Federal Rules of Civil Procedure for summary judgment dismissing all claims against them. (ECF No. 44.) Lawson cross-moves pursuant to Rule 56 for summary judgment in her favor. (ECF No. 47.)

---

[1] Plaintiffs' claim against Defendant the City of New York for municipal liability; Plaintiffs' claims against all Defendants except Aybar, Jonny, Denesopolis, and UC33 for false arrest and failure to intervene; Williams's claims against all Defendants except Aybar for denial of his right to a fair trial; Williams's claims against all Defendants except Aybar, Jonny, Denesopolis, and UC33 for malicious prosecution and failure to intervene; and Lawson's claims against all Defendants for malicious prosecution and denial of her right to a fair trial were voluntarily dismissed on May 30, 2018. (ECF No. 36.)

# BACKGROUND[2]

On July 11, 2014, Defendants and four other New York Police Department ("NYPD") officers were conducting a "buy and bust" operation in Brooklyn, New York. (Defs.' & Pls.' Joint Statement Undisputed Facts Pursuant Local Civ. R. 56.1 ("Joint 56.1") ¶ 10, ECF No. 43.) At approximately 1:00 p.m., UC33 and another undercover officer took a lunch break at a nearby McDonald's restaurant. (*Id.* ¶ 11.) Williams came to the same McDonald's to give his adult son Elson Warren a blue-and-white envelope containing approximately $4,000 in cash. (*Id.* ¶¶ 5, 12–13.) Lawson, Warren's sister, drove Warren to the McDonald's and remained in the vehicle with her two children while Warren entered to meet his father. (*Id.* ¶¶ 4, 14–15.) Inside, Williams handed Warren the envelope containing the cash. (*Id.* ¶ 19.) UC33 observed Williams remove a dark, shiny object, which looked like it was wrapped in a plastic bag, from his pants pocket. (*Id.* ¶¶ 20–21.) UC33 then observed Williams hand the object to Warrren, who placed it in his right waist area. (*Id.* ¶ 20.) At the time, UC33 believed the exchange was a hand-to-hand narcotics transaction. (*Id.* ¶ 87.) Williams and Warren then left the McDonald's. (*Id.* ¶ 22.) Warren returned to Lawson's vehicle. (*Id.* ¶ 25.) Williams walked across the street and toward his home. (*Id.* ¶ 24.)

UC33 called Sergeant Denesopolis, informed Denesopolis that he had observed a hand-to-hand drug transaction between Williams and Warren, and provided descriptions of Williams, Warren, Lawson, and Lawson's vehicle. (*Id.* ¶¶ 29–31.) UC33 did not, however, describe the nature of the object that Williams and Warren had exchanged. (*Id.* ¶ 34.) At the time of UC33's call, Denesopolis was riding in an NYPD vehicle with Detectives Aybar and Jonny. (*Id.* ¶ 32.)

---

[2] The following facts are taken from the parties' joint statement of material facts pursuant to Local Rule 56.1. (ECF No. 43.) Unless otherwise indicated, the facts are undisputed.

Denesopolis relayed the information provided by UC33 to Aybar and Jonny. (*Id.*) From the vehicle, Aybar subsequently observed Williams walking along a path. (*Id.* ¶ 36.) Denesopolis and Jonnny dropped Aybar off and continued to drive toward the McDonald's. (*Id.* ¶¶ 36, 39.) Aybar stopped and frisked Williams and did not find any contraband. (*Id.* ¶ 37.) Nonetheless, Aybar handcuffed Williams. (*Id.*) Aybar and Williams were then picked up by other officers and transported to the McDonald's. (*Id.* ¶ 38.)

Denesopolis and Jonny stopped Lawson's vehicle in the McDonald's parking lot. (*Id.* ¶¶ 39–40.) Jonny ordered Warren out of the vehicle, frisked him, and recovered a black firearm from his waistband and ammunition from his sock. (*Id.* ¶¶ 42–43, 46.) Aybar and Williams then arrived on the scene. (*See id.* ¶ 48.) UC33 identified Warren and Williams as the two individuals he had observed exchange an object inside the McDonald's. (*Id.* ¶ 47.) Warren, Williams, and Lawson were placed in a prisoner van, and Lawson's vehicle was impounded.[3] (*Id.* ¶¶ 51, 60.) Warren asked another officer to locate a large sum of money he had had with him. (*Id.* ¶ 52.) The officer recovered $4,375 in cash from the location where Lawson's vehicle had been, which he showed to Warren and which was vouchered as Warren's property. (*Id.* ¶¶ 53–54.) No narcotics or other contraband—apart from Warren's firearm and ammunition— were recovered at the scene or as a result of the subsequent inventory search of Lawson's vehicle. (*Id.* ¶¶ 55–57, 62.)

Although Aybar had arrived at the parking lot after the weapon was found on Warren, and although Denesopolis had made the decision to arrest Williams and Lawson, Aybar was assigned as the arresting officer of all three individuals. (*Id.* ¶¶ 48, 50, 63.) Aybar completed the

---

[3] Lawson's children were transported to the police station, where they were picked up by their father and grandmother. (Joint 56.1 ¶ 59.)

arrest paperwork—incorporating information he had received from other officers, including UC33's observation of the exchange of a dark, shiny object between Williams and Warren. (*Id.* ¶¶ 21, 65–66.) Aybar transmitted the arrest paperwork to the district attorney's office and signed the charging document against Williams. (*Id.* ¶ 69–71, 73.) The charging document inaccurately indicates that UC33 informed Aybar that the object at issue "appeared to be a firearm." (*Id.* ¶¶ 89–91.) Williams was charged with criminal possession of a weapon and ammunition and detained until his release on bail four days later. (*Id.* ¶¶ 72, 74.) The charges were later dismissed on speedy-trial grounds. (*Id.* ¶ 75.) The district attorney's office declined to prosecute Lawson, who was released from custody the next day. (*Id.* ¶ 76.) Warren's prosecution proceeded in federal district court. (*Id.* ¶¶ 78–81.)

## STANDARD OF REVIEW

Summary judgment must be granted when there is "no genuine dispute as to any material fact and the [movants are] entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The movants bear the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Feingold v. New York*, 366 F.3d 138, 148 (2d Cir. 2004). Where the non-movant bears the burden of proof at trial, the movants' initial burden at summary judgment can be met by pointing to a lack of evidence supporting the non-movant's claim. *Celotex Corp.*, 477 U.S. at 325. Once the movants meet their initial burden, the non-movant may defeat summary judgment only by adducing evidence of specific facts that raise a genuine issue for trial. *See* Fed. R. Civ. P. 56(e); *Anderson*, 477 U.S. at 250; *Davis v. New York*, 316 F.3d 93, 100 (2d Cir. 2002). The Court is to believe the evidence of the non-movants and draw all justifiable inferences in their favor, *Anderson*, 477 U.S. at 255, but the non-movants

must still do more than merely assert conclusions that are unsupported by arguments or facts, *Bellsouth Telecomms., Inc. v. W.R. Grace & Co.*, 77 F.3d 603, 615 (2d Cir. 1996).

## DISCUSSION

I.  **False Arrest and Failure to Intervene**

Defendants argue that Plaintiffs' claims for false arrest and failure to intervene must be dismissed on the ground that there was probable cause to arrest them. (*See* Mem. Law Supp. Defs.' Mot. Summ. J. ("Defs.' Mem.") 8, 25, ECF No. 45.) Indeed, the existence of probable cause constitutes a complete defense to a § 1983 claim for false arrest. *Betts v. Shearman*, 751 F.3d 78, 82 (2d Cir. 2014). It "exists when one has knowledge of, or reasonably trustworthy information as to, facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that an offense has been or is being committed by the person to be arrested." *Id.* (quoting *Williams v. Town of Greenburgh*, 535 F.3d 71, 79 (2d Cir. 2008)).

On the record before the Court, there is insufficient evidence to conclude, as a matter of law, that UC33 had probable cause to arrest Williams. The only evidence supporting probable cause is UC33's observation of the exchange between Williams and Warren. (Joint 56.1 ¶¶ 20–21.) That alone is not enough. Defendants adduce no facts establishing that Williams "was arrested in a location known to have significant narcotics activity." *Morales v. Greiner*, 381 F.3d 47, 48 (2d Cir. 2004). Nor do they marshal any evidence to establish that UC33's "experience and training" enabled UC33 to positively identify an illicit hand-to-hand transaction. *United States v. Gaskin*, 364 F.3d 438, 457 (2d Cir. 2004). This does not, however, end the Court's inquiry, because it was Aybar, not UC33, who arrested Williams.

"When making a probable cause determination, police officers are 'entitled to rely on the allegations of fellow police officers.'" *Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir. 2006) (quoting *Martinez v. Simonetti*, 202 F.3d 625, 634 (2d Cir. 2000)). "Absent significant

5

indications to the contrary, an officer is entitled to rely on his fellow officer's determination that an arrest was lawful." *Loria v. Gorman*, 306 F.3d 1271, 1288 (2d Cir. 2002). "Thus, the determination of probable cause does not turn on whether [the fellow officer's] observations were accurate, but on whether [the arresting officer] was reasonable in relying on those observations." *Bernard v. United States*, 25 F.3d 98, 103 (2d Cir. 1994). Here, UC33 informed Denesopolis that he had observed Williams conduct a drug transaction and provided a description of Williams's appearance and trajectory. (Joint 56.1 ¶¶ 20–21, 27–29.) Denesopolis relayed this information to Jonny and Aybar. (*Id.* ¶ 32.) Based on this description, Aybar identified Williams walking near the road and arrested him.[4] (Joint 56.1 ¶¶ 36–37.) He was legally justified in doing so.

Plaintiffs' argument that any probable cause was limited to a drug offense—that officers required specific probable cause to believe that Williams possessed or sold a firearm—misses the mark. (*See generally* Mem. Law Opp. Defs.' Mot. Summ. J. & Supp. Pl. Lawson Mot. Summ. J. ("Pls.' Opp.") 11–14, ECF No. 48.) "[A] claim for false arrest turns only on whether probable cause existed to arrest a defendant, and . . . it is not relevant whether probable cause existed with respect to each individual charge, or, indeed, any charge actually invoked by the arresting officer at the time of arrest." *Jaegly v. Couch*, 439 F.3d 149, 154 (2d Cir. 2006). That no narcotics were subsequently recovered from Williams or Warren is immaterial to the probable-cause analysis, which turns on only "those facts available to the officer at the time of the arrest and immediately before it." *Panetta*, 460 F.3d at 395 (citation omitted). Moreover, even a mistake of fact would not defeat probable cause. *Bernard*, 25 F.3d at 102–03. Because there was

---

[4] "Handcuffs are generally recognized as a hallmark of a formal arrest." *United States v. Newton*, 369 F.3d 659, 676 (2d Cir. 2004).

probable cause to arrest Williams, his claim for failure to intervene necessarily fails, as well. *See Simcoe v. Gray*, 670 F. App'x 725, 727 (2d Cir. 2016) (summary order) ("[A]bsent a constitutional violation on the part of any of the officers, [a plaintiff's] failure-to-intervene claim necessarily fails.").

Lawson's arrest presents a closer call. Defendants argue that there was probable cause to arrest Lawson for the crime of fourth-degree criminal facilitation. (Defs.' Mem. 11.)

> A person is guilty of criminal facilitation in the fourth degree when, believing it probable that [she] is rendering aid . . . to a person who intends to commit a crime, [she] engages in conduct which provides such person with means or opportunity for the commission thereof and which in fact aids such person to commit a felony.

N.Y. Pen. Law § 115.00. By way of illustration, Defendants direct the Court to *People v. Brun*, 872 N.Y.S.2d 188 (N.Y. App. Div. 2009). (Defs.' Mem. 11.) In that case, the Appellate Division affirmed a jury verdict as to criminal facilitation against a criminal defendant where the evidence at trial "provided a valid line of reasoning and permissible inferences from which a rational trier of fact could conclude that the defendant was guilty of aiding [a] robbery as the getaway car driver." 872 N.Y.S.2d at 190, *rev'd on other grounds*, 938 N.E.2d 965 (N.Y. 2010) (granting writ of error *coram nobis* for ineffective assistance of counsel). The facts of this case are simply not analogous. Unlike in *Brun*, Defendants adduce no evidence that Lawson, for example, was a getaway driver, fled from officers, or, at the time of a non-forceful arrest, "raised [her] hands in a gesture of surrender, stating that [she] knew why the police were there." 872 N.Y.S.2d at 190. Instead, Lawson was seemingly unconnected to any of the events establishing probable cause to believe a crime had been committed. Indeed, Defendants simply maintain that, "[v]iewing the totality of the circumstances known to the officers at the time of the arrest, there was probable cause to arrest plaintiff Lawson for criminal facilitation." (Defs.' Mem. 11.)

7

Conspicuously absent from Defendants' argument, however, is any specific recitation of what those circumstances were.

Defendants further contend that, "to the extent the officers first assumed the transaction was narcotics-related, and then recovered a firearm from Warren's person and a large sum of money in the vehicle, it was reasonable to believe that the vehicle contained narcotics or other contraband." (*Id.*) However, the recovered money is irrelevant to the probable-cause analysis, because it was recovered after Lawson's arrest. *See Panetta*, 460 F.3d at 395 (noting that a court "must consider those facts available to the officer at the time of the arrest and immediately before it."). And Defendants adduce no facts that would connect the firearm recovered from Warren to any criminal conduct by Lawson. Indeed, the transaction between Williams and Warren occurred entirely inside the McDonald's, nowhere near Lawson's vehicle. (Joint 56.1 ¶¶ 17–22.) Although Warren subsequently got into the same vehicle, the firearm and ammunition were not recovered from the vehicle but rather from Warren's person. (Joint 56.1 ¶¶ 25, 43, 46.) There is simply no evidence in the record of any conduct or statements by Lawson regarding the transaction, the firearm, or any other arguably criminal activity. Thus, Lawson was arrested on a mere "hunch," which is insufficient to establish even reasonable suspicion and therefore "obviously less" than is necessary for probable cause, *Navarette v. California*, 572 U.S. 393, 397 (2014).[5] Accordingly, Lawson is entitled to summary judgment on her claim for false arrest.

---

[5] Defendants' alternative argument that there was probable cause to arrest Lawson for the separate crime of harboring a fugitive is without merit. (*See* Defs.' Mem. 12–13.) As already noted, probable cause is determined with reference to facts known to the arresting officer at the time of the arrest. *Panetta*, 460 F.3d at 395. Because, as Defendants concede, officers only became aware of Warren's fugitive status after Lawson's arrest, that fact cannot establish probable cause.

8

The Court cannot make the same determination with respect to Lawson's claim for failure to intervene. "A law enforcement officer has an affirmative duty to intercede on the behalf of a citizen whose constitutional rights are being violated in his presence by other officers." *O'Neill v. Krzeminski*, 839 F.2d 9, 11 (2d Cir. 1988). An officer who assists in an arrest that is unsupported by probable cause may be liable under § 1983. *Gagnon v. Ball*, 696 F.2d 17, 21 (2d Cir. 1982).

> In order for liability to attach, there must have been a realistic opportunity to intervene to prevent the harm from occurring. Whether an officer had sufficient time to intercede or was capable of preventing the harm being caused by another officer is an issue of fact for the jury unless, considering all the evidence, a reasonable jury could not possibly conclude otherwise.

*Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994) (internal citations omitted). Here, it is undisputed that Jonny, UC33, and Aybar were present at the time of Lawson's arrest. It shall be left to the jury to determine whether they had sufficient time to intercede.

## II. Malicious Prosecution of Williams

To state a § 1983 claim for malicious prosecution, a plaintiff must show "(1) that the defendant commenced or continued a criminal proceeding against him; (2) that the proceeding was terminated in the plaintiff's favor; (3) that there was no probable cause for the proceeding; and (4) that the proceeding was instituted with malice." *Kinzer v. Jackson*, 316 F.3d 139, 143 (2d Cir. 2003). Defendants maintain that summary judgment is appropriate because Williams cannot satisfy any of these elements. (Defs.' Mem. 13–17.)

The Court can easily dispense with Defendants' arguments concerning the second element. That is, although Defendants baldly state that Williams's prosecution did not terminate in his favor, they make no substantive argument to this effect. (*Compare* Defs.' Mem. 13 *with id.* at 14–17.) Nor could they, given that where, as here, a criminal prosecution is dismissed on

speedy-trial grounds, the element of favorable termination is satisfied. *Smith-Hunter v. Harvey*, 734 N.E.2d 750, 755 (N.Y. 2000).

With respect to the first element, Defendants correctly note that neither Jonny, Denesopolis, nor UC33 commenced or continued the criminal proceeding against Williams. (Defs.' Mem. 15.) Indeed, beyond the events leading up to his arrest, Williams adduces no evidence of any involvement by these Defendants. Williams attempts to satisfy this element as to Jonny by claiming that Jonny falsely asserted in his complaint report that "Deft [*sic*] was observed to be in possession of a loaded Kel-Tec 9mm pistol . . . in the presence of two minors . . . [and,] while [the arresting officer] did attempt to place Deft under arrest, Deft did flare his arms and try to avoid being handcuffed." (Pls.' Opp. 20 (citing Mindicino Decl. Ex. 6, ECF No. 49-6).) A review of the record, however, reveals that no such statement was included in the arrest report for Williams, which states merely that Williams was observed handing Warren "a black object which was later found to be a loaded black Kel-Tec 9mm pistol." (Mindicino Decl. Ex. 7 at 1, ECF No. 49-7.) Moreover, Williams was not arrested in the presence of minors—Warren was.[6]

By contrast, the conclusion that Aybar commenced Williams's prosecution is plain. He signed the charging instrument. (Joint 56.1 ¶ 73); *see also Cameron v. City of New York*, 598 F.3d 50, 63 (2d Cir. 2010) ("As a matter of law, [the defendant officers'] filing of the Criminal Court Complaint 'initiated' the prosecution against [the plaintiff]."). That there is a genuine dispute as to whether Aybar included fabricated information in the charge only strengthens this

---

[6] The conclusion that Jonny's statement in the complaint report relates to Warren, not Williams, is corroborated by identical statements regarding Warren in the district attorney's office's Complaint Room Screening Sheet. (*Compare* Mindicino Decl. Ex. 6 *with id.* Ex. 3, ECF No. 49-3.)

10

conclusion.  *See Manganiello v. City of New York*, 612 F.3d 149, 163 (2d Cir. 2010) (falsifying evidence and forwarding it to prosecutors may establish the element of initiation).

Even though Aybar commenced the prosecution, which terminated in Williams's favor, the claim is nonetheless defeated by the existence of probable cause.  *Betts*, 751 F.3d at 82.  In this context, probable cause is defined as "such facts and circumstances as would lead a reasonably prudent person in like circumstances to believe [the] plaintiff guilty" of the charges. *Barone v. United States*, 722 F. App'x 57, 60 (2d Cir. 2018) (summary order) (internal quotation marks and citation omitted).  In pressing the charges against Williams, it is undisputed that Williams was observed giving Warren a dark, shiny object and that a firearm was subsequently recovered from Warren's person.  (Joint 56.1 ¶¶ 20–21, 43–44.)  Such evidence alone would lead a reasonably prudent person to believe that the object Williams gave Warren was a firearm, making Williams guilty of criminal possession.  And, as Defendants argue, probable cause for the prosecution was "strengthened by the later-obtained video evidence, which confirmed UC 33's description of Williams' [*sic*] and Warren's interaction inside the McDonald's."[7]  (Defs.' Mem. 14.)  In other words, there was probable cause to prosecute Williams.  The Court is simply unpersuaded by Williams's argument to the contrary, which rests entirely on the notion that there was no probable cause to arrest him.  This argument, however, conflates two distinct legal injuries and ignores the evidence set out above.

Finally, Williams's argument that he has satisfied the malice element depends entirely on a finding of no probable cause, so it fails for the same reasons.  (*See* Pl.'s Opp. 20–21.)  Having

---

[7] The Court is not persuaded by Williams's contention that the surveillance video is exculpatory on the grounds that it "clearly" shows that the object at issue "was a small item, and its transfer in the presence of others did not create the commotion to be expected if a gun was drawn in a McDonald's." (Pl.'s Opp. 18.)  In fact, the video does not clearly depict the object Williams gave Warren.  (*See generally* Lulich Dep. Ex. H (video on file in Chambers).) And given the absence of any allegation that either man brandished a firearm, coupled with the undisputed fact that the object appeared to be wrapped in a plastic bag (Joint 56.1 ¶ 21), the lack of commotion is understandable.

11

failed to adduce sufficient evidence to establish the necessary elements of malicious prosecution against any Defendant, Williams's claim must be dismissed in its entirety.[8]

### III. Qualified Immunity

Defendants argue that they enjoy qualified immunity from liability for Lawson's arrest.[9] (Defs.' Mem. 23–24.) Not so. The question of whether a law-enforcement officer may benefit from qualified immunity from a false-arrest claim "turn[s] on whether the defendant officers' probable cause determination was objectively reasonable—that is, whether there was 'arguable' probable cause to arrest." *Betts v. Shearman*, 751 F.3d 78, 83 (2d Cir. 2014) (quoting *Jenkins v. City of New York*, 478 F.3d 76, 87 (2d Cir. 2007)). Arguable probable cause exists if "officers of reasonable competence could disagree on whether the probable cause test was met." *Jenkins*, 478 F.3d at 87.

Here, no reasonable officer could believe that there was probable cause to arrest Lawson. As discussed above, the suspicious transaction at issue occurred entirely between Williams and Warren, inside the McDonald's and away from Lawson's vehicle. (*See* Joint 56.1 ¶¶ 15–22.) There is no evidence in the record to establish that Lawson said or did anything to participate in or even acknowledge a criminal transaction. The mere fact that Warren subsequently got into Lawson's vehicle while in possession of a firearm is insufficient to establish even arguable probable cause to arrest her. On this record, Defendants cannot avail themselves of qualified immunity.

---

[8] To the extent the complaint could be read to also encompass a claim for failure to intervene in Williams's prosecution, Plaintiffs' failure to respond to Defendants' argument in this regard waives any such claim. (*See* Defs.' Mem. 25 ("[T]here is no evidence that Detective Jonny or UC 33 had any opportunity to intercede in the . . . prosecution of Williams.").) In any event, "[t]here can be no failure to intervene . . . where there was no constitutional violation." *Hardy v. Daly*, 748 F. App'x 379, 381 (2d Cir. 2018) (summary order) (quoting *Tavares v. City of New York*, No. 08-CV-3782, 2011 WL 5877550, at *7 (S.D.N.Y. Oct. 17, 2011)).

[9] Having determined that there was probable cause to arrest and prosecute Williams, the Court need not determine whether Defendants enjoy qualified immunity with respect to those claims. (*See generally* Defs.' Mem. 23–24.)

12

## IV. Denial of Williams's Right to a Fair Trial

The parties dispute whether Williams has adduced sufficient evidence to establish the essential elements of his claim for the denial of his right to a fair trial. (Def.'s Mem. 17–23; Pl.'s Opp. 20–23.) The parties' focus on the elements of a fair-trial claim, however, misses the mark, because the claim's fatal defect is that, under the circumstances of this case, it is duplicative of Williams's malicious-prosecution claim.

In *Manuel v. City of Joliet*, the Supreme Court held that "the Fourth Amendment governs a claim for unlawful pretrial detention even beyond the start of legal process." 137 S. Ct. 911, 920 (2017). There, the plaintiff asserted a § 1983 claim for unlawful detention based on fabricated evidence in violation of the Fourth Amendment. *Id.* at 916. The district court had dismissed the claim on the grounds that the Fourth Amendment applied only before the start of legal process, after which a claim for unlawful pretrial detention must be analyzed under the Due Process Clause. *Id.* The Seventh Circuit affirmed. *Id.* The Supreme Court rejected such a dichotomy in light of its longstanding precedents analyzing pretrial-detention claims under the Fourth Amendment. *Id.* at 917–18. The Court reasoned:

> [P]retrial detention can violate the Fourth Amendment not only when it precedes, but also when it follows, the start of legal process in a criminal case. The Fourth Amendment prohibits government officials from detaining a person in the absence of probable cause. That can happen when the police hold someone without any reason before the formal onset of a criminal proceeding. But it also can occur when legal process itself goes wrong—when, for example, a judge's probable-cause determination is predicated solely on a police officer's false statements. Then, too, a person is confined without constitutionally adequate justification. Legal process has gone forward, but it has done nothing to satisfy the Fourth Amendment's probable-cause requirement. And for that reason, it cannot extinguish the detainee's Fourth Amendment claim—or somehow, as the Seventh Circuit has held, convert that claim into one founded on the Due Process Clause. If the complaint is that a form of legal process resulted in pretrial detention unsupported by probable cause, then the right allegedly infringed lies in the Fourth Amendment.

*Id.* at 918 (citations omitted).

13

In *Dufort v. City of New York*, the Second Circuit interpreted *Manuel* to stand for the proposition that "claims for pretrial detention based on fabricated or withheld evidence are evaluated as malicious prosecution claims under the Fourth Amendment." 874 F.3d 338, 355 n.7 (2d Cir. 2017). Such is the case here. Williams maintains that Aybar fabricated information in the criminal complaint against him, resulting in Williams's unlawful pretrial detention "for days longer than it might have been." (Pls.' Opp. 23.) *Manuel* requires this claim to be evaluated as one for malicious prosecution.[10] As discussed above, that claim fails.

## CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is GRANTED in part and DENIED in part. Defendants' motion is GRANTED with respect to Williams's claims for false arrest, failure to intervene, malicious prosecution, and denial of his right to a fair trial, all of which are dismissed with prejudice. Defendants' motion is DENIED as to Lawson's claims for false arrest and failure to intervene. Lawson's motion for summary judgment on her claim for false arrest is GRANTED.

The only claim remaining for trial is Lawson's claim for failure to intervene.

SO ORDERED.

Dated: Brooklyn, New York  
      June 28, 2019

s/ LDH  
LaSHANN DeARCY HALL  
United States District Judge

---

[10] Plaintiffs cite two Second Circuit cases permitting fair-trial claims to proceed alongside malicious-prosecution claims: *Garnett v. Undercover Officer C0039*, 838 F.3d 265 (2d Cir. 2016), and *Ricciuti v. N.Y.C. Transit Authority*, 124 F.3d 123 (2d Cir. 1997). (Pls.' Opp. 21–22.) However, those cases predate both *Manuel* and *Dufort*. Similarly, the district-court cases Plaintiffs cite in support of their fair-trial argument either predate *Manuel* and *Dufort* or do not discuss the precedential effects of those binding authorities.